***********
The undersigned have reviewed the prior Opinion and Award based upon the record of proceedings before Deputy Commission Houser. Plaintiff has shown good grounds to reconsider the evidence with regard to the injury by accident of 22 December 2000. Accordingly, the Full Commission reverses in part herein finding a compensable ankle injury and affirms in part the lack of causation of this injury by accident and plaintiff's back condition as found in the Opinion and Award of the deputy commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner and in a Pre-Trial Agreement, which was admitted into the record, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. At all relevant times, defendant-employer regularly employed three or more employees and an employer-employee relationship existed between defendant-employer and plaintiff-employee on or about 22 December 2000, the date of the incident giving rise to this claim.
2. On all relevant dates herein, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On all relevant dates herein, the employer was a duly qualified self-insurer.
4. On all relevant dates herein, plaintiff's average weekly wage was $365.81.
5. At the hearing, the parties submitted the following:
a. A Packet of Plaintiff's Medical Records, which was entered into the record, and marked as Stipulated Exhibit (2);
b. Plaintiff's Employment Records, which were admitted into the record, and marked as Stipulated Exhibit (3);
c. Plaintiff's Answers to Defendant's Interrogatories, which were admitted into the record, and marked as Stipulated Exhibit (4);
d. The Transcript of the Recorded Statement of Mr. John Simpson, which was admitted into the record, and marked as Stipulated Exhibit (5), and;
e. The Transcript of Plaintiff's Recorded Statement, which was admitted into the record, and marked as Stipulated Exhibit (6).
6. The parties submitted the depositions of Dr. Robert Douglas MacArthur, Dr. John Michael Hilts, Dr. G. Scott Dean, Dr. Ronald Gioffre and Dr. Robert Elkins after the hearing before the deputy commissioner, which were received into evidence.
7. The issues to be determined are as follows:
a. whether plaintiff sustained a compensable injury by accident or specific traumatic incident on 22 December 2000, and if so, to what benefits, if any, is she entitled;
b. whether the incident occurring on 22 December 2000 was the result of a pre-existing, idiopathic condition;
c. whether plaintiff's back condition was a pre-existing condition;
d. whether plaintiff's back and right ankle conditions are causally related to the alleged incident of 22 December 2000;
e. whether plaintiff is disabled as the result of the alleged incident of 22 December 2000;
f. whether plaintiff is barred from receiving compensation due to an alleged unjustifiable refusal of suitable employment pursuant to N.C. Gen. Stat. § 97-32;
g. whether plaintiff is entitled to the award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1, and;
h. whether, if plaintiff is found to be entitled to indemnity compensation, defendant is entitled to a credit for short-term and long-term disability benefits paid to plaintiff from an employer funded plan.
 ***********
Based upon the foregoing Stipulations and evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the deputy commissioner, plaintiff was sixty-one years of age, with her date of birth being 18 February 1942. Plaintiff attended high school through the eleventh grade.
2. Plaintiff was initially employed by defendant in 1990 as an OSD (over, short, and damaged freight) clerk. At the time of the incident giving rise to this claim on 22 December 2000, plaintiff had been working for approximately five years in a customer service position in the tracing area. In that position, plaintiff's duties were primarily clerical, and included tracking shipments, answering questions for customers over the telephone, filing documents and using the computer to trace shipments.
3. Prior to 22 December 2000, plaintiff's medical history included non-work related problems with her back and right foot. In 1981, plaintiff underwent surgery performed by Dr. Paul Long to shorten one of her toes on her right foot. In approximately 1997, plaintiff sustained a severe right ankle sprain for which she wore a special shoe for several weeks. On 18 February 2000, plaintiff sustained an injury to her back at home while she was walking a dog. That injury occurred when the dog lurched forward as plaintiff was holding it by the collar. Subsequent to the incident on 18 February 2000, plaintiff was diagnosed with degenerative disc disease, facet arthropathy, and right sciatica. Facet arthropathy is arthritis, or loss of cartilage, in the facet joints that connect vertebrae. As degenerative disc disease causes the discs to deteriorate, the facet joints tend to move and slide causing even further progression of facet arthropathy. Plaintiff's right sciatica, or nerve pain radiating down the leg, suggests nerve root irritation, and when coupled with quadriceps weakness, is suggestive of compression. The credible medical evidence of record establishes that degenerative disc disease, facet arthropathy, and sciatica are conditions that may flare-up with normal activities and cause back pain.
4. Following her 18 February 2000 injury, plaintiff was examined on 7 March 2000 by Dr. Michael J. Hilts. At that time, plaintiff's symptoms included low back pain that was radiating into her right buttocks and down her right leg into her foot. Plaintiff also reported experiencing numbness in her right foot and a cramping sensation in her right calf. Dr. Hilts diagnosed low back pain with right-sided sciatica, and suspected a bulging lumbar disc. Based upon this diagnosis, Dr. Hiltz prescribed physical therapy, and medically excused plaintiff from work. On 18 April 2000, plaintiff returned to Dr. Hiltz and reported having returned to work on 17 April 2000, but that despite taking several standing breaks, she was unable to continue working due to pain and muscle spasms. With plaintiff's symptoms continuing, Dr. Hiltz injected cortisone into her right sacroiliac joint on 25 April 2000, and extended her removal from work until 25 May 2000, at which time she was released to full duty.
5. Near the end of May 2000, plaintiff attempted to return to work, but again was unable to continue working because of back and leg pain. When plaintiff was next examined by Dr. Hilts on 13 June 2000, her condition had worsened, and she reported not being able to work for a week due to extreme right-side pain that was radiating down the back of her hamstring. Following tests that revealed right quadriceps weakness, Dr. Hilts ordered an MRI scan. The MRI performed on 26 June 2000 revealed a bulging disc at L4-L5 without nerve compression. Based upon these results, Dr. Hilts again medically excused plaintiff from work and recommended epidural steroid injections. However, when plaintiff reported no improvement of her back pain and an adverse reaction to the first injection, further injections were abandoned. Plaintiff treated with Dr. Hilts throughout the summer, and he continued to keep her out of work until September 2000.
6. For her symptoms following the 18 February 2000 incident, plaintiff also sought treatment from Dr. Robert MacArthur, her family physician. Dr. MacArthur referred plaintiff to Dr. Joel Hirsch, a neurosurgeon, who first examined her on 21 August 2000. On that date, plaintiff reported experiencing constant right back pain and severe radiating right leg pain that sometimes woke her at nights. Dr. Hirsch diagnosed plaintiff as having degenerative disc disease, and ordered a CT myelogram, which revealed lower lumbar facet arthropathy without disc herniation or nerve root compression. By 30 August 2000, Dr. Hirsch opined that surgical intervention was not required, and recommended that plaintiff return to work.
7. On 31 August 2000, Dr. Hilts released plaintiff at maximum medical improvement from her 18 February 200 injury. Dr. Hiltz also released plaintiff to return to work as of 5 September 2000, with the restrictions consisting of no sitting for more than twenty minutes without a standing break, avoiding bending or stooping, and no lifting over ten pounds.
8. On 8 September 2000, Dr. Hilts completed an Attending Physician Statement in connection with plaintiff's claim for long term disability benefits. On that form, he released her to work effective 25 September 2000 with the same restrictions recommended on 31 August 2000. Dr. Hilts' diagnosis was low back pain with underlying facet joint arthropathy and degenerative disc disease. Additionally, Dr. Hilts indicated that plaintiff's symptoms had not improved, that she continued to complain of pain and weakness, and that her chances of returning to work were only fair. Dr. Hilts also assigned a fifteen percent permanent partial impairment rating to plaintiff's back based upon the anticipation that her degenerative disc disease and facet arthropathy would continue to be occasionally symptomatic.
9. Except for her brief attempts to return to work during the middle of April and late May, plaintiff was out of work from 22 February 2000 to 2 October 2000. Between March and September 2000, plaintiff received short term and long term disability benefits pursuant to a disability plan funded entirely by defendant.
10. On 2 October 2000, plaintiff returned to work for defendant in her customer service representative position in the tracing area. With her assigned restrictions, plaintiff's job was modified to not require bending, stooping, or lifting of heavy objects. Additionally, plaintiff was informed by Ms. Kathy Burton, her supervisor, that she could stand up and walk around as needed. Subsequent to plaintiff's return to work on 2 October 2000, Ms. Burton testified that she heard plaintiff complain to customers on several occasions about lower back pain and radiating pain in her right leg. At hearing before the deputy commissioner, plaintiff denied making any such complaints.
11. On 22 December 2000, plaintiff was walking across the loading platform when she stepped on a small object, causing her to lose her balance and twist her ankle. Plaintiff further testified that as she lost her balance, she struggled to keep herself from hitting the ground, and twisted her back in the process.
12. Mr. John Simpson, defendant's platform supervisor, saw plaintiff coming down the stairs then she disappeared from his view. He went to her aid after the incident and observed her bent over holding her ankle. When plaintiff informed Mr. Simpson that she had twisted her ankle on an object, he inspected the loading dock floor but was unable find the object which caused plaintiff to fall.
13. From her home the evening of 22 December 2000, plaintiff telephoned Mr. L.B. Clayton, defendant's Greensboro terminal manager. The credible evidence of record reveals that during this conversation plaintiff informed Mr. Clayton that she had turned her ankle, but made no reference to having injured her back. When plaintiff next returned to defendant's place of business, she completed an Employee Statement of Injury, which described the nature of her injury as a "twisted right ankle." This written statement makes no reference to any back symptoms, and plaintiff has offered no reasonable explanation for this omission.
14. On the day of the incident at issue, plaintiff sought medical treatment at Jamestown Family Practice, where she was examined and X-rays were taken. Following these diagnostic tests, plaintiff was diagnosed as having sustained a right ankle sprain. In this matter, an issue has been raised regarding the contents of the medical records and office notes from plaintiff's initial examinations. Plaintiff testified that although the records and notes make no reference to back pain, that she did report that symptom to medical providers at her initial examinations. The records do reflect that plaintiff reported being injured when she stepped on a small object. On 26 December 2000, plaintiff returned to Jamestown Family Practice, and reported that her right ankle was improving. Again, although plaintiff contends that she did mention her back condition at this appointment, no reference to her back is found in the medical records from that date.
15. On 31 December 2000 plaintiff reported to Jamestown Family Practice that she was experiencing a "flare up of low back pain" which she related to bulging discs diagnosed in June 2000. At that time, plaintiff was written out of work until 15 January 2001 and was advised to follow up with the specialist who had been treating her for her chronic back complaints.
16. On 10 January 2001, plaintiff presented to Dr. Scott Dean, Dr. Hilts' colleague. On that date, plaintiff reported experiencing low back and radiating pain. Following an examination, Dr. Dean diagnosed plaintiff as having low back pain with a possible radicular component and no evidence of muscle weakness. Dr. Dean also concluded that plaintiff's condition did not require surgical intervention, and recommended a course of physical therapy. Although plaintiff was given a physical therapy referral, she never called the therapist to make an appointment and did not return to Dr. Dean, who had not medically excused her from work.
17. Plaintiff returned to work without restrictions on 15 January 2001 when her right ankle sprain had fully resolved, and continued working through 21 February 2001. During this period, the credible evidence of record is that plaintiff continued to experience the same back and leg pain she had experienced during the majority of 2000. At the hearing before the deputy commissioner, plaintiff testified that on 21 February 2001 she complained of back pain to Ms. Burton, and was told she could go home. Plaintiff has not returned to work since that date.
18. Subsequent to 21 February 2001, plaintiff continued to treat with Dr. MacArthur, who continued to prescribe narcotic pain medications for her symptoms. On 14 March 2001, an MRI ordered by Dr. MacArthur revealed degenerative disc disease consistent with the first MRI obtained in June 2000.
19. On 8 May 2001 plaintiff was examined by Dr. Ronald A. Gioffre, a board certified orthopedic surgeon. During this initial examination, plaintiff did not relate her low back and right leg pain to any injury at work. Though plaintiff's symptoms were consistent with sciatica, Dr. Gioffre was unable to find an objective basis for them. Effective 8 May 2001, Dr. Gioffre released plaintiff to work with restrictions of not lifting over twenty pounds and no prolonged sitting with standing breaks several times an hour. Dr. Gioffre's subsequent physical examination on 19 June 2001 did not reveal any change in plaintiff's condition. Nonetheless, he wrote her out of work "indefinitely" pending additional tests he had ordered based upon plaintiff's continued complaints.
20. On 5 July 2001, plaintiff was last examined by Dr. Gioffre. On that date, Dr. Gioffre backdated a note writing plaintiff out of work for her degenerative disc disease effective 8 May 2001, despite the fact that there had been no change in her condition since he began his treatments. Dr. Gioffre has explained that he backdated the note based upon the belief that plaintiff had actually returned to work, but had been unable to tolerate it because of her pain. At his deposition, Dr. Gioffre further testified that this backdated note would not be valid if plaintiff had never attempted to return to work. The credible evidence of record is that in fact plaintiff never made such an attempt.
21. On 14 August 2001, and upon referral by defendant, plaintiff underwent an independent medical evaluation by Dr. Robert W. Elkins, a board certified orthopedic surgeon. Following the examination, Dr. Elkins diagnosed plaintiff as having degenerative disc disease and facet arthropathy, with some radiculopathy. Dr. Elkins opined that plaintiff's subjective complaints appeared to be excessive given the objective findings, and recommended anti-inflammatory medication and conservative care. Dr. Elkins further determined that plaintiff had reached maximum medical improvement, with a zero percent permanent partial disability rating. In addition, Dr. Elkins released plaintiff to return to a customer service position for defendant with restrictions consisting of an occasional thirty pound and frequent fifteen pound lifting restriction and the opportunity to vary her position from sitting to standing.
22. By spring of 2001, plaintiff's former position in customer service had been filled. Defendant contends that this was due to plaintiff's extended period of absences. However, defendant did have an available position as manifest clerk on third shift, which ran from 11:00 p.m. to 7:00 a.m. The manifest clerk position required data entry and some phone work, and also permitted a worker to stand and walk briefly as needed. Additionally, the position did not require bending or stooping or lifting more than ten pounds. The manifest clerk position was a permanent position for defendant and was within plaintiff's assigned physical restrictions. At the hearing, Mr. Clayton testified that upon being informed plaintiff had been released to return to work, he telephoned plaintiff and offered her the manifest clerk position. According to Mr. Clayton, plaintiff refused this offer of employment because she did not want to work nights. Following her refusal of the manifest clerk position, her employment with defendant was terminated as of 17 September 2001. Following plaintiff's termination, defendant placed an advertisement for the manifest clerk position. The Full Commission finds Mr. Clayton's testimony regarding this offer of employment to be credible.
23. Regarding any causal relationship between the 22 December 2000 injury by accident and plaintiff's back condition, medical records for the period immediately preceding 22 December 2000 establish that plaintiff experienced a worsening of her symptoms leading up to that date. Plaintiff treated with Dr. MacArthur four times during November 2000, and by the middle of that month, Dr. MacArthur considered plaintiff's back condition to be chronic because it had persisted for such a long period of time. Also at that time, Dr. MacArther prescribed Vicodin for plaintiff's back pain. On 18 December 2000, plaintiff was again examined by Dr. MacArthur for complaints of continued low back pain described as being severe. By this date, plaintiff had been prescribed Percocet for her pain, an even stronger medication that Vicodin, and further indicative of the worsening of plaintiff's back symptoms. Consistent with plaintiff's complaints to Dr. MacArthur of severe low back and radiating leg pain, plaintiff missed nine days of work in November 2000 and approximately two weeks from 4 December 2000 to 18 December 2000.
24. Although medical histories and physicians' notes do not always document everything reported by a patient, when the records from 22 December 2000 and 26 December 2000 are examined in light of the totality of the evidence, including records from examinations immediately preceding the incident at issue, the only reasonable inference is that the lack of a reference in the early medical notes to back symptoms is due to the fact that no such reference was in fact reported by plaintiff to the treating physicians.
25. The documents completed in connection with plaintiff's second application for disability benefits further establish that plaintiff's back condition was continuing to worsen independent of any work-place incident as of 22 December 2000. The form completed by Dr. MacArthur on 26 March 2001 notes that plaintiff's condition was unchanged since he began treating her for back pain in November 2000. At his deposition, Dr. MacArthur explained that this notation by him meant, among other things, that plaintiff's back condition had not significantly worsened since the beginning of his treatment. As the result of these additional applications plaintiff received $3,367.52 in short-term and long-term disability benefits pursuant to an employer funded plan during the period of March 2001 and August 2001.
26. For her symptoms, plaintiff has also sought pain management treatment. At her initial treatment on 18 September 2001, plaintiff reported experiencing right low back pain with radiating leg pain. However, at that time, plaintiff herself related her back pain to February 2000, with the reasonable inference being the 18 February 2000 dog incident, and made no reference to the 22 December 2000 incident. Likewise, when plaintiff completed the initial assessment questionnaire, she noted that she had experienced pain for nineteen months, or since approximately February 2000.
27. Dr. MacArthur, Dr. Hilts, and Dr. Dean all testified that the incident as described by plaintiff could have caused an exacerbation of her pre-existing condition back condition. However, Dr. Elkins, opined to a reasonable degree of medical certainty that the incident as described by plaintiff on 22 December 2000 did not cause an acceleration or exacerbation of the her pre-existing back condition. Dr. Gioffre was unable to render an opinion either way.
28. Plaintiff admitted that she never applied for any jobs or made any other effort to return to work after 21 February 2001.
29. Based upon the totality of the evidence of record, the Full Commission finds credible plaintiff's description of the incident on 22 December 2000. The Full Commission further finds that on that date, plaintiff did sustain an injury by accident arising out of and in the course of her employment with defendant due to the fact that she stepped on an unidentified object causing her to turn her right ankle. The Full Commission finds that the injury by accident of 22 December 2000 did not aggravate plaintiff's pre-existing back condition. In fact, the reasonable inferences are that plaintiff's back condition was gradually worsening prior to 22 December 2000 and that it continued to worsen subsequent to that date independent of any work-place incident.
30. The manifest clerk position offered by defendant to plaintiff was a suitable transitional position, and her refusal of it was unjustified.
31. Defendant's defense of and actions in this case have been reasonable and have not been based upon stubborn, unfounded litigiousness.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 22 December 2000, plaintiff's average weekly wage was $365.81, yielding a compensation rate of $243.88. N.C. Gen. Stat. § 97-2(5).
2. Plaintiff did sustain an injury by accident to her right ankle arising out of and in the course of her employment on 22 December 2000. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff's compensable injury by accident of 22 December 2000 did not cause an acceleration or exacerbation of her pre-existing back condition. N.C. Gen. Stat. § 97-2(6).
4. As a result of her injury by accident to her right ankle, plaintiff was totally disabled from 22 December 2000 through 15 January 2001, and is entitled to total disability compensation at the rate of $243.88 per week from 22 December 2000 through 15 January 2001. N.C. Gen. Stat. §97-29.
5. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the compensable injury to her right ankle as may reasonably be required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25, 97-25.1.
6. Defendant is entitled to a credit for all short-term and long-term disability benefits paid to plaintiff from the employer funded plan. N.C. Gen. Stat. § 97-42.
7. Defendant's defense of and actions in this case have been reasonable and have not been based upon stubborn, unfounded litigiousness, plaintiff is not entitled to the award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation at the rate of $243.88 per week from 22 December 2000 through 15 January 2001 subject to defendant's credit for overpayment.
2. Defendant shall pay all reasonable and necessary medical expenses incurred for treatment of plaintiff's right ankle injury, which are causally related to plaintiff's compensable injury subject to statutory time limitations and after said expenses have been approved by the Industrial Commission.
3. Defendant shall pay the costs.
This the 13th day of January 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/llc